**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT BRESLOW and MONICA BRESLOW, | C.A. NO. **18-908-RGA** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| JOHN H. KLEIN and BARRY A. POSNER, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

NOW COME Plaintiffs Robert Breslow and Monica Breslow, by and through their undersigned counsel, and file this action against Defendants John H. Klein and Barry A. Posner, and in support of such action state:

### INTRODUCTION

1.      In the spring of 2016, Robert and Monica Breslow were first introduced to John Klein and his company, which is now operating as Cambridge Therapeutic Technologies, LLC ("CTT").   CTT is a pharmaceutical company specializing in packaging and delivery of medication to patients designed to improve medication adherence.

2.      Klein wanted the Breslows to invest in his company, and he enlisted the help of his friend, and longtime business associate, Barry A. Posner, an attorney with the law firm of Kudman Trachten Aloe LLP, to assist with his scheme to induce the Breslows to invest in CTT.

3.      Klein and Posner have been business associates for decades.  For example, in 1997, Klein was the Chief Executive Officer, the Chairman of the Board, and a Director of MIM Corporation.  Posner was MIM Corporation's Vice President, Secretary, and General Counsel.

4.      Klein and Posner knew that by facilitating the Breslows' investment in CTT, they could, among other improper conduct, funnel business from CTT to one or more companies owned by Posner, including what turned out to be a $250,000 payment from CTT to Dispense Point, a company owned in part by Posner.

5.      In addition, Klein promised Posner that he would have CTT enter into an employment agreement with Posner following the Breslows' investment, under which CTT would pay Posner $400,000 per year, plus benefits, to act as CTT's Executive Vice President of Business Development, Regulatory Compliance and Legal Affairs.

6.      To entice the Breslows to invest in CTT, Klein, with the knowing assistance of Posner, made numerous promises and representations to the Breslows, including certain statements described below.

7.      First, Klein and Posner represented that Klein was the founder and sole owner of CTT.

8.      Second, Klein represented that he had personally invested approximately $11 million in the company.  Posner knew that Klein had made this representation to the Breslows.

9.      Third, Klein and Posner represented that CTT owned all of the intellectual-property rights to the copyrights, trademarks, patents, and patent applications necessary to CTT's business.  This included rights to a valuable FDA-approved New Drug Application ("NDA 50-824") that would allow CTT, exclusively, to market and sell a significant product – a combined package of three commonly handled prescription drugs.

10.     Knowing how important it was to the Breslows that CTT own NDA 50-824, as well as other key intellectual property, Klein personally guaranteed the Breslows – in two written contracts – that CTT did in fact own the NDA and other intellectual property.   Klein also

represented that he would indemnify the Breslows and hold them harmless with respect to any breach of his representations regarding NDA 50-824 and other intellectual property.

11.     Fourth, Klein and Posner represented that CTT's present and existing financial health was very strong based on, among other things: (i) solid, and increasing, current product sales in the "non-core" business in which CTT was already operating and would continue to operate indefinitely, and/or (ii) significant revenue and cash flow increases, in a few short weeks or months, based on sales of generic prescription drugs delivered in proprietary compliance packaging, CTT's "core" business.  CTT had used, and presently intended to use, this purportedly solid and increasing existing revenue, as represented by Klein and Posner, to operate its business and grow.

12.     In reliance on these material representations, among others, by Klein and Posner, the Breslows invested $12.5 million in CTT.

13.     Just over a year later, it became clear to the Breslows that none of Klein's and Posner's material representations, upon which the Breslows relied, were true.  To the contrary, each of these representations were false and were known by Klein and Posner to be false when made.

14.     For example, Klein has now admitted, despite his prior representations, that he was not the sole shareholder in CTT.  During all relevant times, Posner was aware that Klein was not the sole shareholder of CTT, despite Posner's representations to the contrary.

15.     Further, Klein also never made his represented $11 million investment in the company.

16.     Additionally, Klein has admitted that, despite his prior representations, CTT does not own, or even have license rights to, NDA 50-824, a fact of which Posner was also aware at all material times.  Instead, NDA 50-824 is owned by another company in which Klein

purportedly has an ownership interest – a material fact that the Breslows did not know at the time of their investment because of Klein's and Posner's representations to the contrary. Upon information and belief, that separate company is deriving revenue as a result of selling products that are the subject of NDA 50-824, which benefits Klein personally.

17.     With regard to CTT's existing financial strength, despite representing that CTT currently had solid, increasing revenue and cash flow that would allow the company to operate and grow, Klein knowingly diverted CTT's sales proceeds that had been deposited in a bank account which was not CTT's primary account and to which CTT's Chief Financial Officer and staff had no access. Then, instead of using that money to fund CTT's operations and growth plans, as he had represented was occurring, Klein used it to pay himself a salary and personal expenses, among other things. Klein never returned CTT's money from this bank account to CTT.

18.     In short, CTT has not been the company Klein and Posner represented to the Breslows in early 2016. The non-core pharmaceutical products that CTT sold prior to the Breslows' investment (represented as generating over $10 million in revenue from March to May 2016) went to zero by the end of September 2016, some three months after the Breslows' investment. And the promised cutting-edge core pharmaceutical distribution business has resulted in less than $50,000 in revenue since October 1, 2016, with no significant increases on the horizon.

19.     Through this lawsuit, the Breslows seek redress against Klein and Posner for their illegal scheme to defraud the Breslows of millions of dollars.

## THE PARTIES AND OTHER RELEVANT INDIVIDUALS

20.     Plaintiff Monica Breslow is an Illinois citizen and resident. She is a member of CTT.

21.     Plaintiff Robert Breslow is an Illinois citizen and resident.  He is a member of CTT.

22.     Defendant John H. Klein is a New Jersey citizen and resident.  He currently resides in Bergen County, New Jersey.  Klein is a member, and was, until December 2017, the Chief Executive Officer of CTT.  He also serves as Chairman of CTT's three-person Board of Managers.

23.     Defendant Barry A. Posner is a New Jersey citizen and resident.  He currently resides in Bergen County, New Jersey.  Posner was the Executive Vice President of Business Development, Regulatory Compliance and Legal Affairs for CTT until June 2017.  Posner also was simultaneously an attorney in the law firm Kudman Trachten Aloe LLP.  Posner served as Klein's representative and agent during discussions with the Breslows about their investment in CTT.  The Breslows were led to believe, and in fact believed, that Posner was acting on behalf of Klein with respect to the investment transaction and that Klein provided information to Posner that Klein expected Posner to communicate to the Breslows, sometimes in response to direct questions posed by the Breslows or their representative.  At all relevant times, up until June 9, 2017, Posner served as Klein's designee on CTT's Board of Managers.

24.     CTT is a Delaware limited liability company.  Its principal place of business is Teaneck, New Jersey, which is located in Bergen County.

25.     Non-party Marc Wasserman was, until December 2017, the Chief Financial Officer and Executive Vice President Corporate Development for the Breslow Forsythe Group, LLC.  Wasserman represented the Breslows during discussions with Klein concerning the Breslows' investment in CTT.  Klein and Posner knew that Wasserman was acting on behalf of the Breslows in this regard.  After the Breslows invested in CTT, Wasserman became the Breslows' designee on CTT's Board of Managers.

## VENUE AND JURISDICTION

26.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because (i) the citizenship of the Breslows (Illinois) is completely diverse from the citizenship of Klein (New Jersey) and Posner (New Jersey), and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.   The Court also has subject-matter jurisdiction under both 28 U.S.C. § 1331, because Counts IV and VI arise under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and 28 U.S.C. § 1367, because Counts I through III and Counts V and VII are part of the same case or controversy as Counts IV and VI.

27.      The Court has personal jurisdiction over Klein because, among other reasons, by signing CTT's Operating Agreement and agreeing to its forum-selection clause, Klein consented to personal jurisdiction in the United States District Court for the District of Delaware for resolution of any suit, action, or other proceeding arising out of or based upon the Operating Agreement.   The United States District Court for the District of New Jersey has held that the Operating Agreement's forum-selection clause covers this lawsuit.[1]   Moreover, Klein has represented that Delaware is the appropriate forum for this lawsuit.[2]

28.      The Court has personal jurisdiction over Posner because he signed the Operating Agreement, both as a representative of CTT and as an individual member.   By signing the Operating Agreement, Posner consented to the same forum-selection clause that the New Jersey District Court held applies to this dispute and requires that the dispute be heard in Delaware.[3]

---

[1] *See Robert Breslow & Monica Breslow v. John H. Klein*, Case No. 2:17-cv-06912 (D. N.J.) (D.I. # 16).
[2] *See Robert Breslow & Monica Breslow v. John H. Klein*, Case No. 2:17-cv-06912 (D. N.J.) (D.I. # 9-1).
[3] *See Robert Breslow & Monica Breslow v. John H. Klein*, Case No. 2:17-cv-06912 (D. N.J.) (D.I. # 16).

29.     The Court also has personal jurisdiction over Posner because he transacted business in Delaware by filing CTT's Certificate of Merger with the Delaware Secretary of State, which was done in furtherance of Klein's and Posner's scheme to fraudulently induce the Breslows' investment in CTT.  Indeed, Posner was aware that without the preparation and filing of this Certificate of Merger, the Breslows' ultimate investment in CTT would not have been consummated.  Moreover, by using a Delaware limited liability company as a device to further their fraudulent scheme, Posner purposefully availed himself of Delaware law.

30.     Venue is proper in this Court because, among other reasons, both Klein and Posner consented to it by agreeing to the forum-selection clause in CTT's Operating Agreement.

## BACKGROUND

### A.      The Breslows' Investment in CTT.

31.     This lawsuit centers around the Breslows' $12.5 million investment in CTT.  That transaction closed on approximately June 15, 2016.

32.     As part of the transaction, three agreements were executed.  Klein, the Breslows, and CTT entered into a Unit Purchase Agreement, dated June 15, 2016 ("Unit Purchase Agreement").  At the Breslows' insistence, Klein signed the Unit Purchase Agreement individually for the purpose of, among other things, personally agreeing to § 3.9, in which he represented and warranted to the Breslows that CTT owned, or had a license to use, NDA 50-824, as well as other intellectual property.  The Breslows relied on the Unit Purchase Agreement, and Klein's affirmative representations therein, when deciding to invest in CTT.

33.     In addition to the Unit Purchase Agreement, Klein signed a letter agreement with the Breslows, dated June 15, 2016 ("Letter Agreement"), in which Klein (i) reaffirmed, among other things, his representations in the Unit Purchase Agreement regarding CTT's ownership or license of NDA 50-824, and (ii) agreed to hold the Breslows harmless and to indemnify them

with respect to any breach of such representations.  The Breslows relied on the Letter Agreement when deciding to invest in CTT.

34.     Klein, the Breslows, Posner, and CTT also entered into an Operating Agreement, dated June 15, 2016.  The Operating Agreement has subsequently been amended.

35.     Under the Unit Purchase Agreement, the Breslows received 20,000 Class A Units in CTT.  In exchange, they paid $12.5 million.  The Breslows paid the first $7.5 million upon closing of the investment transaction on approximately June 15, 2016.  They paid the remaining $5 million on approximately July 20, 2016.

36.     The Unit Purchase Agreement, in the Disclosure Schedules, also provides that Posner would immediately commence employment with CTT and receive a base annual salary of $400,000, plus benefits.

37.     The Breslows would not have invested in CTT but for Klein's and Posner's representations to them during pre-investment communications and/or in the Unit Purchase Agreement and Letter Agreement.  Those representations are detailed below.

**B.     The Breslows Are Approached Regarding a Possible Investment in CTT.**

38.     In mid-April 2016, the Breslows were approached by Jeremy Adamic, an investment banker with Alternative Investment Resource, to discuss possible investments, including investing with Klein's company, CTT.  On information and belief, Klein himself was Adamic's client and Adamic was acting on Klein's behalf.

39.     As part of this introductory process, on information and belief, Klein directed Adamic to provide the Breslows a written presentation about CTT outlining, among other things, Klein's business plan for the company.   On information and belief, Klein reviewed the presentation and knew it would be provided to potential investors, like the Breslows.

40.     In the written presentation, Klein represented himself as being a recognized leader in the United States generic-pharmaceutical industry with over 24 years of experience.  Klein also represented that, since 1995, he returned to investors over $3.3 billion through companies in which he had been directly involved.

41.     With respect to CTT, when Adamic provided the presentation to the Breslows, it was represented that Klein was the Chief Executive Officer and had personally invested $11 million in the company.

42.     The investor presentation also stated that CTT had developed and was to begin commercializing a proprietary solution that enables doctors to safely dispense a variety of pre-packaged, calendarized, generic-drug combinations directly to patients from the doctors' offices. Klein later confirmed these written representations, describing CTT's products to the Breslows as revolutionary and something that was going to change the entire terrain of the pharmaceutical supply chain.  NDA 50-824 covered one of those purportedly revolutionary products.

43.     In reliance on Klein's express representations about CTT's capabilities, as set forth in the presentation and otherwise, and the fact that Klein himself claimed to have invested $11 million of his own money in the company, the Breslows began discussions with Klein about investing in CTT, and ultimately did invest $12.5 million.  Wasserman played a lead role in those discussions, on behalf of the Breslows.  Klein knew that Wasserman was acting in such a capacity.

44.     On approximately April 20, 2016, Wasserman and Klein had a telephone conference to discuss CTT, what type of investment Klein was seeking, and what opportunities CTT presented for the Breslows.  During that telephone call, Klein made several material representations about himself and CTT that were critical to the Breslows' ultimate decision to invest in CTT.

45.     First, Klein again represented that he was the founder, and 100% owner, of CTT and had personally invested approximately $11 million in the company.

46.     Second, during this telephone call, Klein advised Wasserman of the benefit of CTT having proprietary designs for the packaging of combinations of generic prescription drugs, which doctors commonly prescribed together, one of those being the product approved as NDA 50-824.  Klein also represented CTT's ownership of NDA 50-824 and the NDA's extremely significant value, given the expensive, lengthy, and difficult process to get FDA approval of an NDA, and the fact that NDA 50-824 gave CTT the exclusive right to sell the associated combined package of three drugs.  It was significant to the Breslows that a relatively new company, like CTT, had an FDA-approved NDA, like Klein represented CTT did.

47.     At no time during his call with Wasserman did Klein disclose that CTT did not have full ownership of the intellectual property necessary for CTT to market and sell what Klein described as its core products, including the critical product associated with NDA 50-824.

48.     Third, during this call with Wasserman, Klein represented that CTT already had strong current cash flows just two months into sales of products in its non-core business. According to Klein, CTT had at least $2 million in revenue in March 2016 and $2.8 million in April 2016.  Based on Klein's representations, the Breslows understood and relied upon the fact that those sales resulted in either cash receipts or valuable account receivables for CTT, which the company was using, and would continue to use, to operate and grow.  During his telephone call with Wasserman, Klein further stated that CTT would achieve $28-$30 million in revenue in 2016 without any capital infusion, and $400 million in revenue in 2017 with $186 million in cash flows.  These statements were false.

**C.      Klein and Posner Continue to Make Key Misrepresentations to the Breslows.**

49.     Based on the material misrepresentations Klein made in the investor presentation and during the call with Wasserman, the Breslows continued their discussions with Klein about investing in CTT.

50.     The Breslows and Wasserman also communicated with Posner about investing in CTT.

51.     Throughout the communications that the Breslows and Wasserman had with Klein and Posner, Klein and Posner continued to make and repeat several representations of material fact, which induced the Breslows to invest in CTT, including that: (i) Klein was the founder and 100% owner of CTT, (ii) Klein had personally invested $11 million in CTT, (iii) CTT owned certain key intellectual property, including NDA 50-824, which was a valuable asset necessary for production and marketing of one of CTT's key "core" products, and/or (iv) CTT was performing well and financially healthy based on sales from its non-core business and the sales and revenues presently expected from the distribution of its core products, including the unique product associated with NDA 50-824.

**1.      Klein's claimed ownership and investment in CTT.**

52.     Throughout the process, Klein continued to represent that he personally invested $11 million in the company.  In addition, Klein and Posner continued to represent that Klein was the sole owner of CTT.

53.     For example, when the Breslows received, on May 16, 2016, a draft Operating Agreement that mentioned another entity (identified as WTM) as a possible owner of CTT, Wasserman asked Klein and Posner to clarify whether WTM owned units in the company.

54.     Posner responded via email on May 17, 2016, and assured Wasserman that: (i) WTM did not own units in CTT, (ii) WTM was at one point a possible investor in the company but would not be investing, and (iii) Klein alone owned CTT.

55.     Posner knew these representations were false when he made them.  For example, just months before this email, Posner's law firm, Kudman, and on information and belief Posner himself, prepared a separate unit purchase agreement that sold shares of CTT to a third party, thus demonstrating Posner's knowledge that Klein was not the sole owner of CTT.

56.     Posner made the foregoing false assurances on behalf of Klein to facilitate the Breslows' investment.   Klein knew Posner would be communicating such assurances to Wasserman in response to Wasserman's question.

57.     At the Breslows' request, Klein's representation that he was the founder and sole owner of CTT was also memorialized in the parties' Letter Agreement.  Specifically, Klein represented that "Founder [defined as John H. Klein] is the founder and owner of 100% of the Company's equity prior to the Investor's [defined as the Breslows] purchase of the Company's Class A Units.  As such, the Founder will receive direct and indirect benefits from the Investor's purchase of up to 20,000 . . . of the Company's Class A Units at the First Closing."

58.     It was important to the Breslows, and a material factor in their decision to invest in CTT, that Klein's representations that he was the sole owner of CTT and had invested $11 million of his own money in the company were true.  These facts, which Klein strongly reinforced to the Breslows, showed that Klein believed in and was committed to CTT and its future.  It also showed the Breslows that Klein had his own "skin in the game" – to the tune of $11 million – and would be highly motivated to ensure CTT's success for all of its members.

59.     Klein and Posner both knew, through multiple communications regarding the Breslows' potential investment in CTT, that their representations to the Breslows that Klein was

CTT's sole unit holder were important to the Breslows, and that the Breslows relied on such representations when deciding to invest in CTT.

60.     Klein and Posner also knew that Klein's representations that he had personally invested $11 million in CTT were important to the Breslows, and that the Breslows relied on such representations when deciding to invest in CTT.

61.     Klein's and Posner's representations to the Breslows were knowingly false.

62.     Klein was not CTT's sole unit holder, as represented.  In fact, there were, and on information and belief, are, multiple other unit holders unrelated to Klein, who Klein and Posner did not disclose to the Breslows at the time of the Breslows' investment.

63.     To date, the Breslows have been unable to determine all other owners of CTT units, or those who may have options or some other right to purchase units, because Klein refuses to provide that information to the Breslows, despite their repeated requests.

64.     It has also become clear that Klein did not invest the $11 million in CTT, as he represented he had.  Under § 7.2 of the Unit Purchase Agreement, Klein may receive, under certain circumstances and conditions, repayment of a $3 million debt that CTT allegedly owes to him.  But prior to receiving any such repayment, Klein is required to provide to the Breslows "documented proof of [Klein's] investments into the Company of at least $11 million."  Despite demands to do so, Klein has never provided such "documented proof" to the Breslows.

65.     Notwithstanding Klein's failure to provide the required "documented proof," the Breslows have learned that Klein and Posner misrepresented to CTT's then Chief Financial Officer that Klein had, in fact, provided the required "documented proof" to the Breslows and through such fraud caused CTT to repay him $500,000 of the purported $3 million debt.

66.     The Breslows confronted Klein about the wrongful receipt of the $500,000 and again demanded to see "documented proof" of his alleged $11 million investment in CTT, to

which the Breslows are entitled under the Unit Purchase Agreement. Klein continues to stonewall the Breslows by refusing to provide any such proof. Klein has also refused to pay back to CTT the $500,000.

67.     Klein's stonewalling and lies make clear that he did not invest $11 million of his own money in CTT and that his representations to the contrary were false.

68.     Absent Klein's and Posner's representations that Klein was the sole owner of CTT, and absent Klein's representations that he had personally invested $11 million in the company, the Breslows never would have signed the Unit Purchase Agreement and invested $12.5 million in the company.

### 2.     CTT's alleged ownership of NDA 50-824.

69.     Klein and Posner also repeatedly represented to the Breslows that CTT owned all of the key intellectual property. This included NDA 50-824, which was necessary for CTT to, exclusively, package and market one of CTT's purportedly game-changing products.

70.     For example, on approximately June 3, 2016, Wasserman and Posner, on behalf of Klein, had a telephone conversation in which they discussed how important NDA 50-824 was to CTT, its business model, and its success.

71.     During that telephone call, Posner again represented to Wasserman that NDA 50-824 and other important intellectual property were owned by CTT. Upon information and belief, Posner knew at this time that his representation was false. Posner and Wasserman also discussed Wasserman's request on behalf of the Breslows that Klein represent and warrant in the closing documents that NDA 50-824 was owned by CTT, given how critical the NDA was to the Breslows.

72.     To the Breslows, that CTT supposedly owned the extremely valuable and critical NDA 50-824 was a central fact in their decision to invest in CTT. The Breslows understood that

NDAs are so valuable because the process of obtaining FDA approval is lengthy and expensive. Based on Klein's and Posner's representations that CTT owned NDA 50-824, and the fact that the FDA approved it, CTT would be able to sell the critical product covered by NDA 50-824, or CTT could sell the NDA, a valuable asset, to a third party or license the rights to a third party.  In short, NDA 50-824 was, based on Klein's and Posner's representations, a very valuable asset for CTT.

73.     Because NDA 50-824 was so important to them, the Breslows required Klein to expressly represent and warrant in the Unit Purchase Agreement and Letter Agreement that CTT owned, or had a license to, NDA 50-824 and other key intellectual property.

74.     With respect to the Unit Purchase Agreement, under § 3.9 and its associated schedule, Klein represented and warranted, among other things, that CTT "owned, or [was] under license" to use, NDA 50-824 and other key intellectual property.  The Unit Purchase Agreement places absolutely no limit on CTT's right to use NDA 50-824.

75.     At the Breslows' demand, Klein also executed the Letter Agreement, reaffirming his representations in the Unit Purchase Agreement.  "As an inducement to [the Breslows] to purchase the Class A Units [in CTT], and as a condition to such purchase," Klein represented that he would indemnify the Breslows and hold them harmless with respect to any breach of his representations regarding NDA 50-824 and other intellectual property.

76.     Despite Klein's and Posner's multiple representations to the contrary, CTT does not own, or even have a license to use, NDA 50-824.  Klein has now admitted this fact.

77.     The Breslows have learned, and Klein has admitted, that NDA 50-824 is owned or licensed to be used by another company, Gastro-Entero Logic, LLC ("GEL"), which is based in the Cayman Islands and is unrelated to CTT.

78.     Klein has represented that he holds a 34% interest in GEL.

79.     On information and belief, GEL is using NDA 50-824 and deriving revenue from it.  As a significant owner of GEL, Klein has personally benefitted from such use.

80.     Had the Breslows known that CTT does not own NDA 50-824, they never would have signed the Unit Purchase Agreement and invested $12.5 million in the company.

### 3.     Klein's and Posner's misrepresentations to the Breslows regarding CTT's financial condition.

81.     Like they did with respect to the misrepresentations regarding Klein's alleged ownership of and personal investment in CTT, and the company's alleged ownership of NDA 50-824, Klein and Posner continued to make misrepresentations to the Breslows regarding CTT's financial condition and continuation of its non-core business.

82.     For example, Klein touted CTT's strong financial position by representing to the Breslows that CTT was already achieving significant sales from its important non-core business, which CTT presently intended to continue indefinitely.  During a telephone conversation on approximately April 25, 2016, for instance, Klein represented to Wasserman that CTT's monthly revenue from the sale of non-core products was already in the $5 million to $6 million range and would increase to $7 million to $8 million in the near future.

83.     Similarly, on approximately June 1, 2016, Posner, on behalf of Klein, represented to the Breslows that CTT presently intended to continue selling, indefinitely, at least two non-core products, Diclofenac and Lidocaine, that alone would generate revenue of $10 million to $15 million per month.

84.     Klein and Posner, on information and belief, also directed Legacy Packaging, the entity that CTT had partnered with to package and distribute CTT's products, including its non-core product line, to provide the Breslows and Wasserman information showing the product

shipments and invoices for 2016 as of June 7, 2016.  That information showed, as of June 7, 2016, CTT customers had been invoiced for $10,689,570 of non-core product.

85.    Despite Klein's and Posner's prior representations and assurances to the Breslows that CTT presently intended to continue, indefinitely, its cash-generating non-core business, upon which the Breslows relied, shortly after the deal with the Breslows closed, CTT sold off all of its existing non-core product below cost and abruptly exited the marketplace – completely.

86.    Klein's and Posner's representations about CTT continuing its non-core business were false when made.

87.    In addition to his misrepresentations about CTT's non-core business, Klein provided false financial statements to the Breslows to induce them to invest in the company.  For example, on approximately July 16, 2016, after the Breslows made their initial $7.5 million investment in CTT and signed the Unit Purchase Agreement, but before they made their second payment of $5 million, Klein provided to the Breslows financial statements for CTT.  The balance sheet he provided showed net income from January 1, 2016 through May 31, 2016 of $3,165,000 and net liabilities of $7,771,000.  The Breslows relied on these financials when investing the $5 million second payment.

88.    After the Breslows made the $5 million second payment on approximately July 20, 2016, it became clear that the financial statements Klein provided just days before the second payment were false.  Indeed, on approximately August 22, 2016, Klein provided the Breslows with new financial statements which reduced the previously reported net income to $748,946 – a reduction of almost $2.5 million, greater than 75% of net income reported a month before.  Similarly, net liabilities increased to over $15 million – almost double what had been represented just one month before.

89.     Klein's and Posner's repeated representations to the Breslows that CTT had strong cash flow and revenues, which the Breslows understood CTT had been using, and would continue to use, to fund its operations and grow, were also false.  For example, after the Breslows invested in CTT, Klein informed them that many of the receivables identified in the financial detail they previously received were in fact uncollectible.  This included a $3.9 million receivable from Med Creations, a CTT customer.

90.     Klein's statement was false, and he knew it.  Before Klein told the Breslows that the Med Creations receivable was uncollectible, Klein knew that it had already been paid in full.  Specifically, the $3.9 million was paid into a bank account – account number 5904 at PNC Bank ("Account 5904") – that CTT no longer used as its primary account and to which CTT's then Chief Financial Officer and staff had no access.  Only Klein had access to Account 5904.

91.     After the Breslows closed on their investment transaction, all of the money in Account 5904 was supposed to be transferred to CTT's new bank account.

92.     Indeed, on approximately June 3, 2016, Wasserman asked Posner whether all the money in Account 5904 (at the time supposedly $1 million) belonged to CTT.

93.     Posner responded via email on June 3, 2016, assuring Wasserman that all of the money in Account 5904 belonged to CTT.

94.     Despite the foregoing, Klein never told the Breslows that customers such as Med Creations had paid in full their receivables and had the money deposited in Account 5904.  Nor did Klein transfer, or cause to be transferred, to CTT the money in Account 5904, which included not only the $3.9 million from Med Creations, but also money from other customers.

95.     All of the money in Account 5904 belonged to CTT – not to Klein, individually.  Despite this, Klein used the money in Account 5904 to, among other things, improperly pay himself a salary (on top of the $1.2 million salary, plus benefits, he was already collecting) and

personal expenses, including, but not limited to, real-estate taxes, income taxes, bills for his American Express credit card, and the cost of season tickets for the Chicago Bears.  It also appears that Klein used significant sums of the money to pay off investors undisclosed to the Breslows.

96.     Had the Breslows known the truth about CTT's financial condition, and how Klein intended to and did use CTT's assets for his own benefit, the Breslows never would have signed the Unit Purchase Agreement and invested $12.5 million in CTT.

## COUNT I: FRAUD / FRAUDULENT INDUCEMENT (KLEIN)

97.     The Breslows incorporate paragraphs 1 through 96 as if set forth fully herein.

98.     As detailed above, Klein made false representations of fact, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) Klein had personally invested $11 million in the company, (iii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iv) CTT would remain in its non-core business, and (v) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.

99.     Klein made such representations with knowledge or belief that the representations were false, or, in the alternative, made them with reckless indifference to the truth.

100.     Additionally, in making such misrepresentations, Klein acted with malice or with willful and wonton disregard for the Breslows and the harm such misrepresentations would cause them.

101.     Klein's representations were an essential part of the transaction between Klein, the Breslows, and CTT, and material to the Breslows' decision to invest.

102.    Klein made such representations with the intent to induce the Breslows to act upon his representations by investing in CTT.

103.    The Breslows acted in justifiable reliance upon Klein's representations by investing $12.5 million in CTT.

104.    Had the Breslows known that Klein's representations, as detailed above, were false, they would not have executed the Unit Purchase Agreement and invested $12.5 million in CTT.

105.    As a proximate result of Klein's misrepresentations, upon which the Breslows relied, they have suffered significant damage.

## COUNT II: BREACH OF CONTRACT (KLEIN)
### (Section 3.9 of the Unit Purchase Agreement)

106.    The Breslows incorporate paragraphs 1 through 96 as if set forth fully herein.

107.    The Unit Purchase Agreement entered between the Breslows and Klein as to § 3.9 was a valid contract.

108.    The Breslows and Klein intended to be bound by § 3.9 of the Unit Purchase Agreement, as evidenced by the terms of the agreement and their signature to the agreement.

109.    Section 3.9 of the Unit Purchase Agreement is supported by valid consideration, including, but not limited to, the Breslows' $12.5 million investment in CTT.

110.    Section 3.9 of the Unit Purchase Agreement contains sufficiently definitive terms setting forth the terms and conditions to which the parties agreed to be bound, including, but not limited to, terms regarding CTT's ownership of, or license to use, certain intellectual property, and Klein's obligations and representations to the Breslows regarding that intellectual property.

111.    Klein breached his obligations under § 3.9 of the Unit Purchase Agreement by misrepresenting that CTT owned, or had a license to use, all of the intellectual property – including NDA 50-824 – identified in § 3.9 and its accompanying schedule (Schedule 3.9).

112.    As a proximate result of Klein's breach, the Breslows have suffered significant damage.

### COUNT III: BREACH OF CONTRACT (KLEIN)
### (Letter Agreement)

113.    The Breslows incorporate paragraphs 1 through 96 as if set forth fully herein.

114.    The Letter Agreement entered between Klein and the Breslows was a valid contract.

115.    The Breslows and Klein intended to be bound by the terms of the Letter Agreement, as evidenced by the terms of the agreement and their signature to the agreement.

116.    The Letter Agreement is supported by valid consideration.  In fact, the Letter Agreement specifically states that Klein agrees to its terms in order to induce the Breslows to purchase Class A Units in CTT and as a condition to that purchase.

117.    The Letter Agreement contains sufficiently definitive terms setting forth the terms and conditions to which the parties agreed to be bound, including, but not limited to, terms regarding Klein's agreement to indemnify the Breslows for any breach of, or misrepresentation in, the representations and warranties made in § 3.9 of the Unit Purchase Agreement.

118.    Klein breached his obligations in the Letter Agreement by misrepresenting that CTT owned, or had a license to use, all of the intellectual property – including NDA 50-824 – identified in § 3.9 and its accompanying schedule (Schedule 3.9).

119.    As a proximate result of Klein's breach, the Breslows have suffered significant damage.

## COUNT IV: FEDERAL SECURITIES FRAUD (KLEIN)
### (Section 10(b) of the Exchange Act and Rule 10b–5)

120.    The Breslows incorporate paragraphs 1 through 105 as if set forth fully herein.

121.    The Unit Purchase Agreement involves the sale of securities in CTT to the Breslows.

122.    As detailed above, Klein made false representations of fact in connection with the sale of CTT securities to the Breslows, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) Klein had personally invested $11 million in the company, (iii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iv) CTT would remain in its non-core business, and (v) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.  Klein's false representations of fact are material because any reasonable investor would have considered each of them as an important factor in deciding whether to invest in CTT.

123.    Klein made these material misrepresentations with the knowledge or belief that they were in fact false or, in the alternative, with reckless indifference to their truth. Furthermore, as shown above, Klein made the false representations to the Breslows with the intent to deceive, manipulate, and defraud them into investing in CTT at an inflated price of $12.5 million, which personally benefited Klein.

124.    The Breslows acted in justifiable reliance upon the multiple representations Klein made to them and, in particular, would not have invested in CTT – and certainly not at the inflated price of $12.5 million – had they known that Klein's factual representations were false, as described above.

125.    Klein's misrepresentations caused the Breslows to suffer a direct economic loss because, for the reasons set forth above, the CTT securities were dramatically overpriced and worth considerably less than the $12.5 million that the Breslows paid for them.  Again, the Breslows would not have executed the Unit Purchase Agreement and invested $12.5 million in CTT had they known the true state of affairs.

126.    Klein proximately caused the Breslows' direct economic loss because his misrepresentations were intimately related to the underlying value of CTT and were a substantial factor that induced the Breslows to invest in CTT, which they would not have otherwise done.

## COUNT V: FRAUD (POSNER)

127.    The Breslows incorporate paragraphs 1 through 96 as if set forth fully herein.

128.    As detailed above, Posner made false representations of fact, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iii) CTT would remain in its non-core business, and (iv) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.

129.    Posner made such representations with knowledge or belief that the representations were false, or, in the alternative, made them with reckless indifference to the truth.

130.    Additionally, in making such misrepresentations, Posner acted with malice or with willful and wonton disregard for the Breslows and the harm such misrepresentations would cause them.

131.    Posner's representations were an essential part of the transaction between Klein, the Breslows, and CTT, and material to the Breslows' decision to invest.

132.    Posner made such representations with the intent to induce the Breslows to act upon his representations by investing in CTT.

133.    The Breslows acted in justifiable reliance upon Posner's representations by investing $12.5 million in CTT.

134.    Had the Breslows known that Posner's representations, as detailed above, were false, they would not have executed the Unit Purchase Agreement and invested $12.5 million in CTT.

135.    As a proximate result of Posner's misrepresentations, upon which the Breslows relied, they have suffered significant damage.

136.    In addition, as detailed above, Defendant Klein committed fraud by, among other things, making false representations of fact, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) Klein had personally invested $11 million in the company, (iii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iv) CTT would remain in its non-core business, and (v) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.

137.    At all relevant times, Defendant Posner was aware that Klein was making these material misrepresentations to induce the Breslows' investment in CTT, and that the Breslows were relying on the misrepresentations.  Nonetheless, Posner never corrected Klein's false statements or otherwise provided the Breslows with information demonstrating the true facts, which Posner could have done.

## COUNT VI: FEDERAL SECURITIES FRAUD (POSNER)
### (Section 10(b) of the Exchange Act and Rule 10b–5)

138.    The Breslows incorporate paragraphs 1 through 96 and 127 through 137 as if set forth fully herein.

139.    The Unit Purchase Agreement involves the sale of securities in CTT to the Breslows.

140.    As detailed above, Posner made false representations of fact in connection with the sale of CTT securities to the Breslows, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iii) CTT would remain in its non-core business, and (iv) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.  Posner's false representations of fact are material because any reasonable investor would have considered each of them as an important factor in deciding whether to invest in CTT.

141.    Posner made these material misrepresentations with the knowledge or belief that they were in fact false or, in the alternative, with reckless indifference to their truth. Furthermore, as shown above, Posner made the false representations to the Breslows with the intent to deceive, manipulate, and defraud them into investing in CTT at an inflated price of $12.5 million, which personally benefited both Klein and Posner.

142.    The Breslows acted in justifiable reliance upon the multiple representations Posner made to them and, in particular, would not have invested in CTT – and certainly not at the inflated price of $12.5 million – had they known that Posner's factual representations were false, as described above.

143.     Posner's misrepresentations caused the Breslows to suffer a direct economic loss because, for the reasons set forth above, the CTT securities were dramatically overpriced and worth considerably less than the $12.5 million that the Breslows paid for them.   Again, the Breslows would not have executed the Unit Purchase Agreement and invested $12.5 million in CTT had they known the true state of affairs.

144.     Posner proximately caused the Breslows' direct economic loss because his misrepresentations were intimately related to the underlying value of CTT and were a substantial factor that induced the Breslows to invest in CTT, which they would not have otherwise done.

145.     In addition, as detailed above, Defendant Klein committed fraud by, among other things, making false representations of fact, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) Klein had personally invested $11 million in the company, (iii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iv) CTT would remain in its non-core business, and (v) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.

146.     At all relevant times, Defendant Posner was aware that Klein was making these material misrepresentations to induce the Breslows' investment in CTT, and that the Breslows were relying on the misrepresentations.   Nonetheless, Posner never corrected Klein's false statements or otherwise provided the Breslows with information demonstrating the true facts, which Posner could have done.

### COUNT VII: AIDING AND ABETTING FRAUD (POSNER)

147.     The Breslows incorporate paragraphs 1 through 105 as if fully set forth herein.

148.    As detailed above, Defendant Klein committed fraud by, among other things, making false representations of fact, including, but not limited to, that: (i) Klein was the founder and 100% owner of CTT, (ii) Klein had personally invested $11 million in the company, (iii) CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iv) CTT would remain in its non-core business, and (v) CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.

149.    Defendant Klein's fraud proximately caused the Breslows' injury by inducing them to invest $12.5 million in CTT, which they never would have done had they known that any of the representations made by Klein were false.

150.    At all relevant times, Defendant Posner was aware that Klein was making these material misrepresentations to induce the Breslows' investment in CTT, and that the Breslows were relying on the misrepresentations.   Nonetheless, Posner knowingly and substantially assisted Klein's scheme by helping facilitate the Breslows' investment in CTT.   For example, Posner never corrected Klein's false statements or otherwise provided the Breslows with information demonstrating the true facts, which Posner could have done.

151.    In addition, Defendant Posner knowingly and substantially assisted Klein with fraudulently inducing the Breslows' investment by, among other things: (i) misrepresenting to the Breslows that Klein was the founder and 100% owner of CTT, (ii) misrepresenting that CTT owned or licensed the key intellectual property – including NDA 50-824 – for producing and selling products that were necessary for CTT's business, (iii) misrepresenting that CTT would remain in its non-core business, and (iv) misrepresenting that CTT's financial performance was strong, and the company was generating significant revenue and cash flow that it used, and would continue to use, to operate and grow.

152.    At all relevant times, Posner knew the misrepresentations detailed above were false when made, or, in the alternative, made them with reckless indifference to the truth.

153.    At all relevant times, Posner was aware of, and accepted, his role in furthering Klein's fraudulent scheme to induce the Breslows to invest $12.5 million in CTT.   Indeed, Posner directly benefited from the scheme.

154.    As a proximate result of Posner aiding and abetting Klein's fraud, the Breslows suffered significant damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert and Monica Breslow respectfully request that the Court enter judgment in their favor and against Defendants John H. Klein and Barry A. Posner, and enter relief as follows:

    a.    Rescission of the Unit Purchase Agreement;

    b.    Rescissionary damages for the harm caused to Robert and Monica Breslow;

    c.    Compensatory and punitive damages;

    d.    Attorneys' fees, costs, and interest; and/or

    e.    Any other relief the Court deems just.

| | |
|---|---|
| Dated: August 3, 2018 | */s/ Lisa A. Schmidt* |
| | |
| Joseph L. Fogel | Lisa A. Schmidt (#3019) |
| Michael P. Kornak | Jeffrey L. Moyer (#3309) |
| FREEBORN & PETERS LLP | Matthew D. Perri (#6066) |
| 311 South Wacker Drive, Suite 3000 | RICHARDS, LAYTON & FINGER, P.A. |
| Chicago, Illinois 60606 | 920 North King Street |
| (312) 360-6000 | Wilmington, Delaware 19801 |
| jfogel@freeborn.com | (302) 651-7700 |
| mkornak@freeborn.com | schmidt@rlf.com |
| | moyer@rlf.com |
| *Of Counsel* | perri@rlf.com |
| | |
| | *Counsel for Plaintiffs* |
| | *Robert Breslow and Monica Breslow* |